Final case for argument this morning is 24-1593, Mosaic Company v. United States. Good morning. Good morning. May it please the Court. Department of Commerce made three fundamental errors in its countervailing duty investigation of phosphate fertilizers from Russia. All three of those errors related to their evaluation of the provision of natural gas for less than adequate remuneration. The first error that we address is their specificity finding. Again, they didn't find a juror. They found a specificity as a matter of fact, the fact of specificity, and they relied on one factor, the predominant use factor. In making their finding that this provision of natural gas was de facto specific to the fertilizer industry. Can I ask you, on page 11 of your blue brief, you say, quote, natural gas is available to all in Russia and widely used by all sectors in the Russian economy with no preferential terms to some users compared to others. How do we know that? I mean, there's some talk in the background, and I know stuff is confidential, so if I start to go into the wrong direction, please stop me. But is there not evidence in the record of subsidies? There is evidence in the record that Gazprom does sell natural gas to use in Russia at regulated tariff schedules. But those regulated tariff schedules primarily are with the consumers in the households, residential use, I should say. But in terms of preferential treatment, what we're getting at there, your honor, is it wasn't giving preference to the fertilizer industry as opposed to power generation, or giving it to the fertilizer industry as opposed to other users in terms of the availability. Wait, I'm getting confused. One of the confusions in this case is we've got the question of whether we divide out the non-industrial versus the industrial, and then there's the question of between the industrial. So I don't know what preferential terms mean. I think we talk about subsidies in this universe, right? So are the so-called preferential terms or the subsidies different with respect to non-industrial versus industrial sectors? Your honor, I'll just back up and say that it's the provision of natural gas itself. Gazprom was found to be a government authority, as was Rosneft, because of the ownership interests by the Russian government in those entities, and that their provision of natural gas was itself the subsidy, because it was all provided for less than adequate remuneration as compared to the benchmark that Commerce uses. But to our point, and you hit the nail on the head, your honor. And is it because the Russian intervention is so ingrained within the gas market that you can't extricate it? Correct. That's what Commerce found as part of its determination. But I think, Judge Prost, you hit the nail on the head when it comes to how do you look at this specificity? And in order to find that the fertilizer industry, which consumed 4.7% of the natural gas, was a predominant user, they looked at only a subset. And our point was, natural gas is... When you say they looked at only a subset, can you just be clearer? Because I'm dividing it up in terms. Your complaint is that they looked at only the industrial, compared to the industrial users. Correct. And not to the economy as a whole. Correct, your honor. And natural gas, there is no dispute. It is used by all of the Russian economy. It's not just for industrial users. And so when you look at... But if the pricing, or the subsidies, or the preferential treatment, or whatever you want to call it, is different with respect to industrial versus non-industrial users, why isn't that sufficient basis for saying we're just going to look at the industrial users? I don't believe there was a specific finding on that, your honor. I don't believe that commerce went to that level. What I do believe is... What about the report at A1977? I don't know if you're familiar with it. This is the Brattle report, your honor? I don't know if this is the Brattle report, but there is a report with a very lengthy chart. First it's in Russian, and then it's translated into English. And at the end of this report at A1977, in the second column it says, in accordance with applicable Russian laws, end consumers buy gas at regulated prices which are differentiated by consumer group, parentheses, households versus the citation that you said, 1977? A1977. It's in the second column, first full paragraph. I see what you're saying. I apologize, your honor. I misinterpreted the wrong... Yeah, I mean, this is from Gazprom. You are correct. I mean, in terms of the pricing itself, Gazprom does indicate that there are potentially different prices. But again, we're looking at whether the provision of natural gas itself is de facto specific, whether the users of natural gas, the fertilizer industry, is a predominant user of natural gas. Whether there was a benefit conferred... Excuse me. Whether a benefit was conferred and therefore countervailable, you're looking at comparing the prices that were paid by my client, Eurochem, and then the other respondent to the benchmark price that Commerce constructs. But in terms of de facto specificity itself, we argue, your honor, that looking at 4.7% is not a predominant use. And even the CIT indicated that it wasn't very significant when it comes to, and I'm probably paraphrasing here... But if you're... I don't get a lot of numbers that are confident in this. Of course. But if you compare it to just the industrial users, it clearly satisfies the predominant user. I've based some of the numbers I see in the record, which I think are confidential. Understood, your honor. If you're only limiting it to the industrial users, that Commerce... But of course, they also eliminated what I would argue is another industry, which is power generation and electricity as well, saying that somehow that's not an industry. And so I think that they jerry-rigged the denominator, if you will, in order to find that there was a predominant user. And I think when you go back to the statute itself, it talks about whether looking at de facto specificity within the context of whether there's a predominant user or not, there's a predominant user within the jurisdiction of the authority. Well, that jurisdiction of the authority is all of Russia, because natural gas is used by all of Russia. And in fact, the state... You're not really challenging the methodology that Commerce used, just the results. No, your honor. I think... And if it's a methodology, point exactly what the problem is with the methodology. I would say it's probably a little bit of both, your honor. The fact that Commerce, they rely primarily... We have the authority and discretion to determine predominant use and what to compare that to. You have to compare it to something. Under the SAA, doesn't Commerce have that authority? Isn't that the intent of the statute? Your honor, I would argue that in the statement of authority, Commerce indicated, or the administration indicated, their prior practice that where a subsidy is broadly used and broadly available within the economy, that's not counter-available. And that's the exact situation we're dealing with here. They've tried to manipulate the comparison to only a subset of industrial users to say, well, whatever usage by the fertilizer industry is a predominant usage when you compare it to only this. But again, you're not tangling with the statute itself, where you're looking at the jurisdiction of which the authority operates, which is all of Russia. To put a finer point on it, I think you would have to agree that when it comes to making specificity determinations, Commerce gets to apply a rule of reason. And that our precedent indicates that Commerce enjoys a certain amount of latitude based on the facts and circumstances and gets to decide and define what's the right framework of thinking about specificity on a case-by-case basis. However, having said all of that, you would say, nevertheless, this was an abuse of discretion to arbitrarily redefine the relevant players to compare your client to just industry and not all end users of natural gas. Is that a fair way to characterize what's going on here? I would agree that it would be an abuse of discretion. But I also say that this prior precedent and Commerce looking at this and interpreting the statute in which they are implementing under 1677 the definitions of specificity, we're not in the Chevron world anymore. And we do note this as, of course, the Supreme Court came out with Lillipup Wright following the opening brief. And our argument is that the CIT should have engaged in that statutory construction of what does it mean to be a predominant use? Is it a matter of looking at and crafting the subset so that you can find a high predominant usage? Or is it when you have a situation like this as the SAA indicated that where a subsidy is broadly available and broadly used across the economy, in that situation, you're not going to find countervailable subsidies. That's why you look for a predominant user, right? Correct. But again, how are you comparing that predominant usage? If you look at it of the fertilizer industry as compared to the fertilizer industry, yes, they're using a ton. If you're using only two industries, again, Commerce is not able to manipulate this, and that's not reasonable. And they haven't used any criteria in which how they determine how the subset is they're going to use, particularly when you're eliminating some industrial users like power generation and electricity. And so how do you make that determination? Are you saying that they didn't eliminate these industries, the power they use just to keep the lights on? That's different than what we're talking about here in the agrochemical industry where they're using it to produce the product. And so isn't it fair to treat that a different way? Well, the fact is that it's still being used, Your Honor. Most of the power generation industry is using natural gas to generate electricity that is then used by others as well. And so it's still a usage that is broadly used within the Russian economy. So your position is they had to use every use, industrial and non-industrial? Absolutely, Your Honor, because the 4.7 percent usage that was in the record for the fertilizer industry was in comparison to all users of natural gas that was being provided by Gazprom. So, Your Honor, that is our position. And I think when you look at the statute as then interpreted by the statement of authority from the Uruguay rounds, I think that's all consistent with that. They don't identify where in the statute they can eliminate and, say, manipulate the denominator in order to effectively inflate the numerator and find a predominant use. I'd like to touch, Your Honor, on sort of the other two issues, and these deal with the benefits conferred by the provision of natural gas. And the first issue, preference is Tier 1, right, Your Honors, where you compare the government price to market prices. Where distortion is caused by government involvement in the economy, you don't look at Tier 1, you go to Tier 2, which is world price. Where there's no world price, you go to Tier 3. And that's where we ended up, Your Honor, in Tier 3. And as the Commerce Department notes, they normally measure the adequacy of remuneration under Tier 3 by assessing whether the government price is consistent with market principles. And they look at price-setting philosophy, cost recovery, but Commerce decided not to do that. And they argue, well, it's distorted because of the government involvement. Well, of course, that's why you're in Tier 3, because government distortion prevents you from looking at the market prices. So if distortion is a reason not to do your normal analysis of looking at the government price, then when would you ever do it? So they ignored their normal practice without really any justification. And, in fact, they had the records to do it. And the Browder report showed them how to do it, where they looked at the government cost setting. They looked at the cost recovery and profitability. And so the data was there. Commerce chose just not to do it. And we would argue that their decision to do so was unsupported by the record, substantial evidence and contrary to law. My final point, Your Honor, is on using the IEA pricing data. Commerce essentially admitted that those prices are prices for natural gas sold in Europe. And they reflect, quote, the market dynamics in that market. Well, we're not in Europe. We are in Russia. And the statute clearly states that Commerce has determined the adequacy of remuneration, quote, in relation to prevailing market conditions for the good being provided in the country which is subject to the investigation review. They did not do that. And their determination was unsupported by substantial evidence and, therefore, not in accordance with law. Okay. I'm going to run through your rebuttal. Thank you, Your Honor. Let's hear from the other side. Good morning. May it please the Court. To address the arguments appellants just raised and presented, starting from the questions the Court raised, I think we can provide some clarity. The argument seems to be that Commerce only looked at a subset, only looked at industrial use. But the record reflects that's actually not what Commerce did to determine whether or not there was specificity in this case. On Appendix 1854, Commerce's final determination. Yeah, I see that. Go ahead. Finish what it says. The Court's already aware of it. We'll just make sure we're on the same page. Not only did Commerce say that the agrochemical sector is the largest industrial consumer, but it's also, quote, among the top five consuming groups. So those are the groups that include household, electricity generation, heat generation. You've got a CIT opinion. Did the CIT reference that? I thought the CIT just relied on the distinction between industrial and non-industrial. That's correct. But the CIT said that this was essentially enough, that Commerce had looked at the industrial and found that this one industrial group. So you want us to decide this case based on let's throw out the CIT opinion and look at all together, and we still win, and you think we're going to do that here? I don't think the Court needs to in any way. I'm just pointing out that when the record is stated that Commerce never looked at this, that's just simply not true. The record reflects. The CIT did not go further. But in order to affirm, don't you agree we have to agree with Commerce and with the CIT that the division of industrial versus non-industrial was the way to go here? Well, my understanding is also that talking about the matter of law and the interpretation of the statute and how to look at what the word a predominant user means and whether a predominant user can be based on industrial, based on non-industrial, the Court can in some ways do a review of that. But in this case, no, we think the Court can simply affirm the CIT and say, CIT looked at this, determined that comparing one industrial user to all industrial users, and especially the Court references the chart on Appendix 1787, which is the data from the government of Russia that shows the comparison industry by industry of how much gas upon gas was being used by each industry. This is not a case where one industry is slightly one step ahead of all the others. This is a case where the agrochemical sector is using a multiplied factor more of natural gas than any other. And I won't go into the actual numbers because they're confidential. OK, but let me back you up a little. Since I got you off of arguing something that was not the basis of the CIT, what is the justification for the government having to have made the distinction between industrial and non-industrial? Well, again, we look to not only what the statute says, which is not, is it the predominant user? Is the industry in question the majority user? These are not the language Congress used. Congress said a predominant user. And the SAA confirms that what Commerce has done is the appropriate way to approach this kind of question. So historically, is there an approach by Commerce that you divide up industrial and non-industrial sectors? Commerce has done that in the past. I know there's a Russian metallurgical case where we looked at just industry by industry. It's in our brief. I don't have the site with me right now, but there have been situations. But just because you've done it before, maybe that alone is not good enough. What is the because for why it is reasonable to divide up the denominator to just include industrial sectors? Because the SAA tells us that's exactly the purpose of the predominance. Well, I don't know if the SAA specifically talks about dividing away all the consuming public and just looking at industry only. You won't find that in the SAA, right? So what do you mean when you say this is what the SAA exactly tells us? I point out that Appellant has quoted language in the SAA where it talks about when a subsidy is spread throughout an economy, but doesn't quote the next sentence, which states, Conversely, the specificity test was not intended to function as a loophole. And the SAA goes on to say, Where the number of users of a subsidy is very large, the predominant use and disproportionate factors would have to be assessed. This is the question of when a subsidy, like this one, and the argument is not being put forward that it's only going to certain industries. The subsidy is on natural gas. But where that subsidy results in what is a de facto subsidy, what the statute tells Congress it must be looking for, and if we find that there is a predominant user, again, not the predominant user, not the majority user, but a predominant user of that subsidy, we have to avoid the loophole, where a broadly applied subsidy across an entire economy somehow escapes the CBD law, because part of that subsidy is also being given out to households and to energy generation and to heating. At the end of the day, the question is not... Well, Appellant is pointing to... That applies essentially to all consumables, water, gas, oil, energy. It could potentially do so. There could be situations where a government has... Water, for example, could... An industry where water is one of its major inputs, where it is creating products using a disproportionate or predominant amount of the water from that country, well, if the government is subsidising water use for all, that still is a subsidy that that one industry is getting a disproportionate or predominant benefit from that is then resulting in unfair trade practices that require a countervailing duty in order to assess and make sure that the trade is fair within the United States. And this is, again, what this court has looked to in the past when it comes to these sort of questions. The AK Steel case. Determinations of disproportionality and dominant use are not subject to rigid rules, must be determined on a case-by-case basis. And quoting from the proposed regulations in that same case, this court noted the specificity test cannot be reduced to a precise mathematical formula and specifically went on to say that the commerce does not err when it looks at relative benefit versus an absolute benefit, versus how much of the total benefit is this one industry getting. So what does relative benefit mean in this context? Well, this is what commerce did. Based on how much of the benefit that's flowing to the industry relative to other industrial users was this one industry getting. And that's the relative benefit commerce looked to here. Of all industrial users, and again the data's on 1787, why is this one standing up? And the numbers are confidential, but the names of the industries are public. The agrochemical industry is compared to the metallurgical industry, the cement industry, the petrochemical industry, the automotive industry, the other industries, which is all other industries as a group. And comes up compared to any one single industry, not just slightly ahead of them, but a multiplied factor ahead of them. The only group that beats it is other industries as an entire group, which you can see the numbers are not significantly higher than the agrochemical industry. Why are we looking at the gross number? Let's say all the industries are tiny. So the gross number is obviously going to be smaller. Why don't we look at a percentage? A percentage of overall costs or overall expenditures? Because if other industries are tiny, the number is going to be small, but that doesn't mean that they're not spending 50% of their income on natural gas. Commerce looked at that as well and noted the heavy use by the agrochemical sector of natural gas. It is not only used as it is in many other industries, but it's also an ingredient, a component into the fertilizer. And that's how Russia came up with the 4.7% number was in the exhibit, I believe it's called the Gas Exhibit, and that is on Appendix 1030. The mathematical formula that creates this 4.7% number is based on how much that industry is using in order to create the product it creates. So this is where this comes from. It's not just looking at numbers, but looking at this raw percentage, this mathematical data as to how much of this product this one industry is using. That information is then taken and then we look at, well, how does that compare to other industries? And that's where we find out, oh, it's not just a little bit more. Again, I can't speak to the exact numbers, but a multiplied factor more than any other industry. And we come again to what this court has told us to do in AK Steel, in the Royal Thai Government, requiring a comparison of absolute benefits, requiring Commerce to compare all users of a subsidy and say you must get above a certain number. This court said that could produce an untenable result. And that's what Commerce relied upon in reaching this decision again here. Now, we've agreed to split our time with the Intervenors' Council. I do want to, if I have your court's permission, to address briefly the other issues the appellant has raised in terms of the benefits. Well, you're going to be eating into your friend's time if you do that, and we have a briefing on the issues. You do indeed. I will just point out the court to pages 1864 and 1866 of the appendix very briefly. Just to point out that Commerce specifically explains that it did attempt to create a market comparison with the Russian data on the tier 3 basis, but because Gazprom prices are distorted, they don't reflect market principles, so therefore that was impossible to do so and it had to use other data. And 1866 explains that the EU natural gas prices are reasonable as a benchmark because those prices include gas coming from Russia, the same gas that we're trying to find out what is the market rate. Well, we're seeing people buy that in the open market. Isn't the price of Russian natural gas in the market likely a good benchmark for what the price of Russian natural gas would be on the open market? Unless, of course, there are any further questions, I'll see the rest of my time to Intervenors. Thank you. Morning. May it please the Court. I'm David Ross with WilmerHale. I'm here representing the Mosaic Company. I'd actually like to address quickly some of the questions that you raised to the government and specifically why the Commerce Department limited its analysis in the way that it did. The reason it did is because the statute, the statutory language on de facto specificity, says that a substance de facto specificity is a specific if first. The actual recipients, whether considered on an enterprise or industry basis, are limited in number. An enterprise or industry is a predominant user. An enterprise or industry receives a disproportionately large amount of the subsidy or the manner in which the authority provides the subsidy is exercised discretion in its decision to grant it in a way that indicates that an enterprise or industry is favored over others. So in other words, the statute is focused on what are enterprises or industries receiving relative to other enterprises or industries? And that's a particularly appropriate approach in this case because, to your point, your question early in the argument, yes, there are different prices. So as Judge Chen noted, there is a price for industrial users and there's a price for consumers. And here, when Commerce asked the Russian government to provide the regulated prices for natural gas in Russia on a monthly basis during the POI, the Russian government provided regulated wholesale prices for natural gas to industrial consumers. And that's at appendix 1966 to 1975. So it didn't even provide data for other users. It was industrial users. So how do we know they're different? Well, we don't know if they're different, Your Honor. I don't think that's on the record. But we do know that the Russian government itself differentiates between industrial consumers and other consumers in setting regulated prices for natural gas. And to your point, it was reasonable and within the agency's discretion to look at the usage in this way, consumption by natural gas users, because what does it matter whether consumers are using natural gas to heat their apartment or to cook? What's relevant under the countervailing duty law is are industries getting an advantage from a subsidy that is specific? It's particularly appropriate in this case. As Judge Chen said, there's discretion, depending on the cases, case by case, because in this case, the agrochemical industry uses natural gas not just for power, but they also use it as a raw material input into the production of the subject merchandise. So it's used to produce ammonia, and it's used to produce fertilizer. And that's something that the CIT found. Is that relevant in the other industrial users? There's nothing in the record on that. How come they didn't divide it up that way? I mean, I take your point that maybe it's a significant feature of the agrochemical industry, but nobody divided it up and say, well, they're on their own because they're using it in a different way than other people are using it, and we don't even have to do all this analysis. The Russian government. That's your question. Yeah, because they're pervasively subsidizing, but in different ways through different programs and for different purposes. And with respect to natural gas for industrial use, which is the data that they provided, Commerce looked at the information, and they found that the agrochemical industry was far and away the largest user compared to other industries in Russia. And I should add, by the way, that even under this approach, which the appellants don't support, there are going to be industries in Russia where their subsidized natural gas isn't going to become available, even though they're getting a subsidy because their usage isn't relative, say, to the agrochemical industry significantly substantial. But for this particular industry, in this particular case, they're clearly the biggest consumer. I think I've got one minute to go, so the other issue I just wanted to very quickly touch on is the waiver point. So as we've stated in our brief, on the de facto... Can you give me the IEA OECD prices? Your Honor. The last argument about the OECD market prices for natural gas and why that's correct and why... Absolutely, Your Honor. ...downward to take into account. No, no, for sure. So on that issue, we have to step back and see the overall point of the benefit assessment, and it is to determine whether the financial contribution is providing a benefit. And the way that you determine if it's providing a benefit is you look for some market benchmark you can compare it to to determine whether it's on market terms. Here, Commerce found that the entire Russian market was so pervasively distorted by gas promise pricing that there were no appropriate in-country benchmarks under either Tier 1 or Tier 3. The appellants say that under the law for Tier 3, you can't consider distortion in assessing a situation for a Tier 3 analysis. But that's... If that were true, you can't find counter-availability because the whole point is, is there distortion? That's what you're trying to measure. And so if the environment is so distorted that there's no adequate benchmark inside of Russia, you can go elsewhere. And here you have the IEA data on the record. It was information that Commerce had used before in other cases. It was information that the CIT has affirmed. The only other information on the record was a brattle report, which Commerce had found was unusable for various reasons, which are in the record and which also Judge Astani cited in her opinion. So that wasn't appropriate, and so the IEA one was the one that they used, and that was a reasonable decision. Thank you. Thank you. Excuse the court. The chart that has been referenced on 1787, it's important to do a distinction here. 1786 is the chart from Gazprom, which is the government authority that provided the subsidy, and that's where the usage is 4.7 as compared to other industries. The chart that my friend from Commerce or the Department of Justice identified on 1787, this is the transmission of natural gas from all producers. So it's not just the government authority, but also, like, Novotec and other independent gas producers that there's no finding that they were from, you know, a government authority. And so those numbers are not really the reliable numbers. What you're looking at is the 4.7 as Gazprom is the government authority in doing that comparison. I'll also note, Judge Reyna, you'd asked about water, energy, and other types of resources, and my friend from the Department of Justice noted about disproportionate usage. That's a different factor. They didn't look at that. And our position is that whether someone is a predominant user, you need to look at all users of the subsidy. Why would you look at a household use of a subsidy if they don't export a product? They're not creating a product for export. That's fair enough, Your Honor, except that when I go back to the statement of authority from the Uruguay rounds, it talks about this exact type of situation. Well, they don't talk about that. That's why you would look for a predominant user because if you don't do that, then you create the loophole that the SSA is talking about. I don't view this as being a loophole. Again, Your Honor, the SSA is specifically talking about those situations where a subsidy, here in natural gas, is, no dispute, widely available, widely used throughout Russia, and so this is the exact type of situation that's not going to be countervailable in those situations. I will also note, Your Honor, that last point about using the IEA pricing data, again, prevailing market conditions in Russia. That's what the statute says. IEA prices by European consumers that are not in Russia, that's reflecting a short market where they are huge consumers of natural gas, whereas Russia is a huge producer of natural gas. Supply and demand dynamics are different. Commerce should have looked at that per the statute. And unless Your Honors have any further questions... Thank you.